IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JUN 2 8 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

AUTOMOTIVE FINANCE CORP.          )
                                  )
          Plaintiff,              )
                                  )
     v.                           )     1:10cv1407(LMB/TRJ)
                                  )
EEE AUTO SALES, INC., et al.      )
                                  )
          Defendants.             )

## MEMORANDUM OPINION

Before the Court is the plaintiff's Motion for Summary
Judgment [Dkt. No. 82]. For the reasons stated in open court and
in this Memorandum Opinion, that motion will be granted.

## I. Background

### A. The Parties' Agreements

This civil action arises from a floor-plan financing
arrangement involving several Northern Virginia used car
dealerships. Plaintiff Automotive Finance Corporation ("AFC"), an
Indiana corporation that provides inventory financing for
independent automobile dealers throughout the United States,
initially entered into a floor-plan financing arrangement in 1999
with defendant EEE Auto Sales, Inc., d/b/a EEE of Tyson, along with
several related corporations (EEE of Fairfax, LLC; EEE Automotive,
Inc., d/b/a EEE of Springfield; and EEE of Sterling, Inc.)
(hereinafter collectively referred to as "EEE Auto Sales" or "the
dealership defendants"). Under that financing arrangement, AFC,
the lender, provided funding for the defendant dealerships'

automobile inventory purchases. The dealerships were then expected to sell those automobiles to retail customers, while holding proceeds from those sales in trust for the benefit of AFC. See Pl.'s Mot. for Summ. J. at Ex. 1 (May 11, 2011 Decl. of Jerome L. Bosl) ¶¶ 2-3.

Over the course of the parties' decade-long relationship, AFC and EEE Auto Sales entered into a series of promissory notes and related agreements to secure the various inventory financing loans extended by AFC. The most recent of those agreements, which supersede all of the previous agreements between AFC and the defendants, were executed by AFC and EEE Auto Sales in November 2009 and March 2010.[1] Those agreements specifically provide that "[u]pon the sale of any item of Purchase Money Inventory, Dealer [EEE Auto Sales] shall hold the amount received from the disposition of inventory in Trust for the benefit of LENDER [AFC]." Id. at Exs. 1-1 and 1-2 (Article 4.0 of the Notes, dealing with "Sales of Purchase Money Inventory").

Moreover, as further security for the inventory financing loans, defendants Venus Financial, Inc. ("Venus" or "Venus Financial"), Enayet Rashid ("Rashid"), and Fatana Aziz ("Aziz")

---

[1] Specifically, on November 10, 2009, the EEE Auto Sales defendants entered into a Demand Promissory Note and Security Agreement corresponding to AFC Account Number 42870. On March 29, 2010, EEE Auto Sales entered into a second Demand Promissory Note and Security Agreement corresponding to AFC Account Number 352360. See id. at Exs. 1-1 and 1-2 (attaching copies of those documents, hereinafter collectively referred to as "the Notes" or "the Security Agreements").

2

(hereinafter collectively referred to as "the Guarantors")[2] each guaranteed the dealership defendants' obligations to AFC by executing several agreements to that effect. Specifically, on November 11, 2009 and April 7, 2010, each of the Guarantors executed an Unconditional and Continuing Guaranty of EEE Auto Sales's obligations to the plaintiff. See id. at Ex. 1-3 and 1-4 (attaching copies of the agreements, hereinafter collectively referred to as "the Guaranty Agreements" or "the Guaranties"). Pursuant to those Guaranties, each of the Guarantors is obligated to "immediately pay the amount due and unpaid" by the dealership defendants in the event of default. Id. The Guarantors are also jointly and severally liable to AFC for all costs, expenses, and attorneys' fees incurred by AFC in connection with enforcing the terms of the Demand Promissory Notes and Security Agreements. Id.

## B. Defendants' Breaches

In accordance with the terms and conditions of the Notes and Security Agreements, AFC advanced funds and otherwise provided financing to the dealership defendants for use in purchasing motor vehicles to be sold at EEE Auto Sales's retail car lots. EEE Auto Sales, however, defaulted under the Notes by failing to make timely

---

[2] Venus Financial is a Virginia corporation that was in the business of providing auto loans to customers purchasing cars from EEE Auto Sales. See Defs.' Mem. in Opp. re: Mot. for Prelim. Inj. at Ex. 1 (Decl. of Fatana Aziz) ¶ 5. Defendant Aziz is the President of Venus, and defendant Rashid is her husband. Id. ¶ 3. Aziz and Rashid also owned and managed the now-defunct EEE Auto Sales businesses.

payments due to plaintiff and by selling certain units of its inventory, valued at more than $3 million, to its retail customers without properly remitting the funds to AFC or holding the received amounts in trust for the benefit of AFC, a practice referred to in the commercial lending industry as "selling out-of-trust" ("SOT"). See id. at Ex. 1 (Bosl Decl.) ¶ 18.[3]

Upon learning of the SOT issue, AFC initiated negotiations with defendants in an effort to address and resolve the matter. As a result of those negotiations, on November 2, 2010, AFC, EEE Auto Sales, and the Guarantors all entered into a Forbearance Agreement whereby AFC agreed to forbear from exercising certain legal rights, including filing a civil lawsuit, in exchange for the defendants satisfying certain conditions. See id. at Ex. 1-5 (attaching a copy of the Forbearance Agreement). Together with that Forbearance Agreement, defendant Venus Financial executed a Collateral Security Agreement and Pledge, granting AFC a security interest in all of Venus's assets and collateral (including, but not limited to, accounts, retail installment contracts, and chattel paper). See id. at Ex. 2-A (attaching the Collateral Security Agreement and Pledge, hereinafter referred to as "Venus Security Agreement"). Venus also executed a Power of Attorney, permitting AFC to act on Venus's behalf in connection with transactions involving the Venus

---

[3] According to the Forbearance Agreement signed by the parties, as of November 1, 2010, defendants had sold $2,642,429.04 in inventory secured by the November 10, 2009 Note out of trust, along with $549,106.35 in inventory secured by the March 29, 2010 Note. Id. at Ex. 1-5 at 2.

4

collateral.  See id. at Ex. 2-B.  Together, those two documents
grant AFC the authority to collect Venus's receivables directly
from its customers and other debtors.

The Forbearance Agreement signed by the defendants provided
that the forbearance period was to expire on the earlier of
December 15, 2010, or the date on which any breach, or "Termination
Event," occurred.  Id. at Ex. 1-5 ¶ 2(b).  The agreement further
defined a "Termination Event" as a failure to comply with any of
the terms and conditions of the Forbearance Agreement or the
underlying loan documents, including a failure to make all payments
when due.  Id. ¶ 5(a)-(b).

Defendants breached the terms of the Forbearance Agreement in
late November and early December 2010 by failing to comply with
their obligations under Paragraph 4 of that agreement, which
required them, inter alia, to "pay AFC $200,000 by November 5,
2010" and to "pay AFC $500,000 by December 15, 2010."  Id. ¶ 4(a)-
(b).  Specifically, during the weeks beginning November 29, 2010
and December 6, 2010, defendant Rashid, on behalf of the dealership
defendants, expressly stated to AFC that defendants would not be
able to make the required $500,000.00 payment by December 15, 2010.
See id. at Ex. 1 ¶ 21.

C.  Prior Proceedings

Upon learning that EEE Auto Sales could not make the $500,000
payment, AFC filed this civil action on December 13, 2010.  See

5

Dkt. No. 1 (Pl.'s Verified Compl.).[4] On December 17, 2010, all of
the EEE Auto Sales defendants filed a suggestion of bankruptcy, and
this civil action has therefore been stayed as to those defendants.
See Dkt. No. 17 (Dec. 20, 2010 Stay Order). On December 22, 2010,
however, plaintiff notified the Court of its intent to proceed
against the remaining three defendants: Rashid, Aziz, and Venus
Financial. See Dkt. No. 18. On February 3, 2011, with leave of
court, plaintiff filed a First Amended Complaint, asserting claims
for breach of guaranty against those defendants. See Dkt. No. 39
(Pl.'s First Amend. Compl.) ¶¶ 49-54 (Count II).[5] As remedies for
those alleged breaches, plaintiff's First Amended Complaint seeks
monetary damages, along with accrued interest and attorneys' fees
and costs. Id. at 10-11.

On February 28, 2011, the Guarantors filed their Amended
Answer to the First Amended Complaint. See Dkt. No. 44. In that

---

[4] Along with its original Verified Complaint, plaintiff
also filed a Petition in Detinue for Pretrial Order of Seizure,
and a Motion for Preliminary Injunction and Temporary Restraining
Order. See Dkt. Nos. 3 and 4. By an Order dated December 16,
2010, this Court partially granted those motions and entered a
temporary restraining order prohibiting the EEE Auto Sales
defendants from moving, selling, or otherwise disposing or
dispossessing themselves of any vehicles or other collateral
described in the Verified Complaint to which AFC had established
its entitlement. See Dkt. No. 12. That Order was set to expire
on December 27, 2010, but the EEE Auto Sales defendants all filed
for Chapter 11 bankruptcy in the interim.

[5] Count I of plaintiff's First Amended Complaint also
asserts a claim for breach of contract against the EEE Auto Sales
defendants. See id. ¶¶ 45-48. In light of the stay of
litigation against those defendants, this Memorandum Opinion will
solely address Count II, against the Guarantors.

Amended Answer, the Guarantors asserted at least fifteen separate affirmative defenses, including various fraud, unconscionability, unjust enrichment, waiver, and estoppel defenses. Id. at 6-17. The Amended Answer also included defendants' demand for a jury trial and attorneys' fees. Id. However, on March 11, 2011, plaintiff filed a Motion to Strike and for Protective Order, asking the Court to strike defendants' affirmative defenses, along with their demand for a jury trial and their prayer for attorneys' fees and costs. See Dkt. No. 48. By an Order dated May 16, 2011, plaintiff's motion was granted in part, and the vast majority of defendants' affirmative defenses were dismissed, leaving only the Eleventh Defense, dealing with the amount of damages and plaintiff's supposed failure to mitigate such damages, "and any portions of the First and Thirteenth Defenses that similarly deal with mitigation or allege that plaintiff's actions or business decisions were a superseding, intervening cause of any losses." Dkt. No. 76 (May 16, 2011 Order). Defendants' requests for a jury trial and attorneys' fees were also stricken, on the grounds that the defendants had waived those rights in their various agreements with the plaintiff. See id.

During that same time period, plaintiff filed a Motion for Preliminary Injunction, asking that the defendants be enjoined from interfering with AFC's efforts to exercise its rights under the

7

terms of the Venus Security Agreement. See Dkt. No. 52.[6] By an

Order entered on March 25, 2010, that motion was granted, and the

Court entered the requested preliminary injunction, enjoining

defendants and their agents from interfering with any efforts made

by AFC and its agents to collect payments directly from Venus

Financial's customers. See Dkt. No. 60. Under the terms of that

injunction, all of Venus's customers must now remit their regularly

scheduled car payments to a trust account set up by plaintiff's

counsel, Husch Blackwell, LLC; those funds are being held in trust

until the conclusion of this litigation. Id.

AFC has now filed a Motion for Summary Judgment, in which it

argues that there are no genuine disputes of material fact in this

civil action, and that it is therefore entitled to judgment as a

matter of law against the three Guarantor defendants. See Dkt. No.

82. In particular, plaintiff seeks the dismissal of the

Guarantor's remaining mitigation defenses as a matter of law, and

entry of a final judgment in its favor on its claims for breach of

the Guaranty Agreements. Id. at 10-13. AFC also seeks a permanent

injunction prohibiting any further interference by defendants with

AFC's right to enforce the Venus Security Agreement, along with an

---

[6]     Plaintiff had engaged the services of a collection agent,
Vehicle Acceptance Corporation ("VAC"), to act as a servicer of
the Venus retail installment contracts and the Venus accounts.
See Pl.'s Mot. for Prelim. Inj. at Ex. 1 ¶ 7. Defendants,
however, interfered with AFC's collection efforts by urging
Venus's customers to ignore VAC's requests for direct payment and
even threatening to repossess the customers' cars if they did not
continue making their payments directly to Venus instead of to
AFC. Id. at Ex. 2 ¶ 9.

award of reasonable attorneys' fees and costs for pursuing this litigation.  See id. at 14.

## II.  Standard of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 247-48 (1986).  The Court must view the record in the light most favorable to the nonmoving party, and must draw all inferences in favor of that party.  See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002).  However, "the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."  Anderson, 477 U.S. at 252; see also Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008).  Accordingly, to survive a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict."  Thompson Everett, Inc. v. Nat'l Cable Adver., LP, 57 F.3d 1317, 1323 (4th Cir. 1995); Poole v. Pass, 351 F. Supp. 2d 473, 478 (E.D. Va. 2005).

9

## III.  Discussion

At the conclusion of discovery in this civil action,[7] there are no longer any genuine disputes of material fact as to any of the parties' claims or defenses.  Summary judgment will therefore be entered in favor of the plaintiff on Count II of its First Amended Complaint in the amount of $3,156,149.00, and the preliminary injunction entered on March 25, 2010 will be converted into a permanent injunction.

### A.  The Operative Contractual Agreements

There is no genuine dispute that AFC is entitled to judgment as a matter of law against the three Guarantor defendants (Aziz, Rashid, and Venus Financial) on the basis of the operative contractual agreements.  The Guarantors admit to signing the various Security and Guaranty Agreements that set forth the respective rights of the parties.  <u>See, e.g.</u>, Defs.' Amend. Answer ¶¶ 29-30.  Under the terms of those agreements, the Guarantor defendants jointly and severally guaranteed the prompt and unconditional performance and payment of all current and future

---

[7]  The final discovery-related Order in this action, entered by the Honorable Thomas Rawles Jones, Jr. on June 6, 2011, required the plaintiff to produce a number of documents and to file and serve a Rule 34 supplemental response detailing its compliance with that Order no later than June 13, 2011.  <u>See</u> Dkt. No. 91.  Although it does not appear that plaintiff ever filed the Rule 34 response, defendants have not objected that they did not receive the requested documents.  In any event, none of the documents that were the subject of the June 6, 2011 Order appears to have any material bearing on the instant Motion for Summary Judgment.  This matter is therefore ripe for resolution.

10

obligations and liabilities of EEE Auto Sales to AFC, and explicitly guaranteed to pay the EEE Auto Sales dealerships' debts if those defendants defaulted on their loans.  See Pl.'s Mot. for Summ. J. at Exs. 1-3 and 1-4 (providing that the Guarantors must "immediately pay the amount due and unpaid by the [EEE Auto Sales defendants]" upon default).

There is no also dispute that the EEE Auto Sales defendants have defaulted on their payment obligations, and that the Guarantor defendants have likewise failed to honor their obligations to pay the amounts due and owing after that default.  See, e.g., id. at Ex. 1-5, AFC5-000004 (Forbearance Agreement, in which "Borrowers [defendants] acknowledge that the Loan Documents are in default"). In accordance with their obligations as Guarantors, Venus Financial, Aziz, and Rashid, are therefore now jointly and severally liable to AFC for the full amount of the outstanding debt incurred as a result of the EEE Auto Sales defendants' various breaches.  That outstanding debt has been calculated to be approximately $3,156,149.00.[8]

---

[8]  AFC has submitted a declaration explaining how it calculated the defendants' outstanding debt.  See Pl.'s Mot. for Summ. J. at Ex. 1.  That debt originally totaled over $6.6 million, based upon the EEE Auto Sales defendants' failure to pay over $3.3 million, and their sales out-of-trust of inventory worth over $3.3 million.  However, pursuant to an order of the United States Bankruptcy Court for the Eastern District of Virginia ("Bankruptcy Court"), the EEE Auto Sales defendants were required to surrender their vehicle inventory to AFC in January 2011, and sales of that remaining inventory generated proceeds of more than $3.3 million.  EEE Auto Sales also made several cash payments to AFC in the weeks before filing for bankruptcy, and

11

The Guarantors assert that because there is a genuine issue of material fact as to the precise contracts at issue and the specific contractual terms defining the parties' obligations, any grant of summary judgment is precluded. That argument is unpersuasive, as there is no ambiguity in the language of the Security Agreements or the Guaranties at issue in this civil action, nor have defendants plausibly alleged any circumstances that would justify considering any evidence outside of the agreements themselves to interpret their terms. Moreover, under Indiana law, which applies in this case as a result of the forum selection clauses in the parties' various agreements, see id. at Exs. 1-1, 1-2, 1-3, 1-4, 1-5, and 2-A, the Guaranty Agreements are fully enforceable on a claim for breach of guaranty. Indeed, Indiana courts have squarely held that summary judgment is appropriate in favor of a plaintiff where, as here, the principal borrowers have defaulted and the guarantors have refused to answer for those defaults. See, e.g., TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust, 904 N.E.2d 1285, 1290 (Ct. App. Ind. 2009). Finally, although the Guarantors have argued that some other, historical versions of the agreements between the parties might control, rather than the most current versions of the contracts, the language in the Guaranties themselves explicitly provides that the current Guaranties shall be

AFC has succeeded in collecting some monthly payments directly from various Venus Financial borrowers. AFC has represented that all of those payments have been credited to defendants' accounts, thereby reducing the amount of indebtedness to $3,156,148.51.

12

deemed binding without regard to any earlier agreements. See, e.g., Pl.'s Mot. for Summ. J. at Ex. 1-3, AF1-00016 (providing that "[n]o loss of or . . . unenforceability of any other guaranties or other securities which LENDER may now or hereafter hold in respect of any LIABILITIES . . . shall in any way limit or lessen the undersigned's liability under this guaranty.").[9]

The Guarantors' arguments that there is a genuine factual dispute as to plaintiff's quantification of damages are equally unavailing. As noted above, plaintiffs have submitted a detailed declaration explaining their calculation of damages, including all payments and proceeds credited to defendants' accounts. See id. at Ex. 1 (Bosl Decl.). Guarantors dispute the use of the amount due and owing on December 10, 2010 (approximately $6,620,423.00) as an appropriate starting point for damages calculations, but that date is eminently reasonable, as it allows for a clear separation of the amounts due and owing on the underlying contracts from the amounts received in mitigation of plaintiff's damages, once defendants

---

[9] The language in the Guaranty Agreements providing that the Guaranties are "in addition to and not in substitution for any other guaranty," see id., does not dictate a contrary conclusion. Rather, that language simply clarifies that there is no requirement for AFC to correlate its claims against the Guarantors to any particular Guaranty. Moreover, the parties have made clear elsewhere, in Article 9.5 of their Demand Promissory Notes and Security Agreements, that the current agreements at issue in this civil action were meant to supersede all earlier contracts between the parties. See id. at Ex. 1-1, AFC1-0009 (Article 9.5) ("[T]his Note and the documents contemplated hereby contain the entire agreement of the parties with respect to the subject matter hereof.").

13

announced their intent to breach the Forbearance Agreement.
Furthermore, although defendants have asserted that the
dealerships' records show different amounts due and owing as of
December 10, 2010, they have not submitted any evidence in support
of that assertion apart from the conclusory and hearsay-laden
affidavit of defendant Rashid himself.  That self-serving affidavit
is plainly insufficient to present any genuine issue of material
fact.  See Fed. R. Civ. P. 56(e); see also Evans v. Tech.
Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996),
Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988).
There is therefore no genuine basis upon which the defendants can
dispute their liability, or the calculations of the amounts they
owe to AFC.[10]

## B.  Mitigation of Damages

Defendants next argue that AFC failed to properly mitigate its
damages, and that the Court should therefore deny summary judgment
in the amount requested by plaintiff.  Defendants base their
argument on a claim that AFC improperly failed to waive the EEE

---

[10]  In fact, calculating the amounts due to AFC using the
$7,465,043.00 balance stipulated in the November 1, 2010
Forbearance Agreement confirms that AFC's calculation of the
December 10, 2010 balance is accurate.  As stated in a
supplemental declaration by Jerome Bosl, AFC made additional
loans to defendants after November 1, 2010 of $342,983.00, and
received payments totaling $1,255,963.50.  See Reply Br.
Supporting AFC's Mot. for Summ. J. at Ex. 1.  That yields a
balance of $6,552,062.50, and together with $68,360.91 in
additional interest and fees, the total comes to $6,620,423.41.
Id.

14

Auto Sales defendants' and the Guarantors' failures to pay in accordance with their contracts, and failed to accept defendants' alternative offer to make minimum monthly payments of $50,000.00 over five years to settle their outstanding debts.

However, explicit waiver language in the Guaranty Agreements waives "any" and "all" defenses that the Guarantors might otherwise have asserted to AFC's claims for payment. See, e.g., Pl.'s Mot. for Summ. J. at Ex. 1-3, AFC1-00016. That waiver of defenses would presumably include any defense for failure to mitigate damages. The Guaranties also state that the Guarantors' obligations are unconditional and continuing, and that they will not be affected by AFC's actions or failures to act. See id. (providing that "[t]his is an irrevocable, unconditional and continuing guaranty; it shall cover and secure any amount at any time owing on the Liabilities," and further stating that "[t]he obligations of the undersigned hereunder shall not be released, discharged, or in any way affected, nor shall the undersigned have any rights or recourse against LENDER by reason of any action LENDER [AFC] may take or omit to take"). Because such waiver language is fully enforceable under Indiana law, see, e.g., Kruse v. Nat'l Bank of Indianapolis, 815 N.E.2d 137 (Ind. Ct. App. 2004), defendants' mitigation defense fails as a matter of law.

Moreover, even if defendants had not waived their mitigation defense, that defense is based on a fundamental misconception of

15

the duty to mitigate damages. As a matter of law, a party that alleges that its contract has been breached is not obligated to accept some other, less valuable, performance proposed by the breaching party, and the rejection of such an offer cannot possibly establish a viable mitigation defense. <u>See, e.g.</u>, <u>Indianapolis City Market Corp. v. MAV, Inc.</u>, 915 N.E. 2d 1013, 1026 n.6 (Ind. Ct. App. 2009) (holding that refusing extracontractual demands does not constitute a failure to mitigate); <u>Nylen v. Park Doral Apartments</u>, 535 N.E.2d 178 (Ind. Ct. App. 1989) (finding that a landlord's refusal to permit tenants to pay lower rent was not a failure to mitigate); <u>see also</u> <u>E. Coal & Export Corp. v. Beazley & Blanford</u>, 92 S.E. 824 (Va. 1917) (ruling that defendant's mitigation argument regarding plaintiff's refusal to accept a novation was a "perversion" of the "doctrine of avoidable consequences"). As such, whether defendants might eventually have been able to pay down their debt by means of minimum monthly payments is wholly immaterial to AFC's claim, because under the plain language of the Security Agreements, AFC is entitled to full payment on demand. <u>See</u> Pl.'s Mot. for Summ. J. at Ex. 1, AFC1-00009 (Article 9.8).

The Guarantors' argument that the small amount of money collected to date from third party customers on the Venus Financial receivables suggests a failure to mitigate is similarly flawed. In fact, the relatively minimal amount that AFC and its collection

16

agent, Vehicle Acceptance Corporation ("VAC"), have been able to collect from Venus Financial's customers is likely the result, in large measure, of defendants' own interference with AFC's attempts to enforce its rights under the Venus Security Agreement. This Court already found, in issuing its March 25, 2011 preliminary injunction, that Aziz and the other Guarantors interfered with and improperly disrupted AFC's efforts to collect those third-party car payments by, <u>inter alia</u>, threatening VAC representatives with litigation and threatening to have Venus customers' vehicles repossessed if they made their payments to AFC rather than directly to Venus. <u>See</u> Dkt. No. 60 (finding that an injunction was necessary to "eliminate confusion among the Venus account holders, who are uncertain about where to make their payments and fear having their vehicles repossessed"). AFC is plainly not responsible for the Guarantors' interference with its contractual rights, nor can AFC be held liable if some Venus account holders were simply unaware of, or decided to disregard, the injunction.

Accordingly, there is no genuine basis for any of defendants' arguments that plaintiff has failed to mitigate its damages. Instead, it appears that AFC has diligently sought to mitigate its damages by seeking to collect on the Venus Financial account receivables, and by promptly selling the remaining vehicle inventory to which it gained access during the bankruptcy proceedings in a commercially reasonable private auction. <u>See,</u>

17

e.g., <u>Auto. Finance Corp. v. Smart Auto Center, Inc.</u>, 334 F.3d 685,
689 (7th Cir. 2003) (holding that when a floorplan lender sells
vehicles at an auction, that disposition conforms with the Uniform
Commercial Code and is considered to be commercially reasonable).
For these reasons, the remaining mitigation defenses in the
defendants' Amended Answer will be dismissed, and judgment will be
entered in favor of AFC as a matter of law.

    C.   **Permanent Injunction**

      Finally, plaintiff asks this Court to convert its March 25,
2011 Order into a permanent injunction barring defendants from
interfering with AFC's enforcement of the Venus Security Agreement.
That agreement grants AFC an explicit and enforceable interest in
the revenue streams resulting from the payments of Venus's consumer
borrowers and account holders, and further provides that AFC may
enforce its interests by means of "any and all rights and remedies
accorded . . . by the Uniform Commercial Code." <u>See</u> Pl.'s Mot. for
Summ. J. at Ex. 2-A. Such rights include the right of a secured
party to contact account debtors and request that they make
payments directly to the secured party:

> If so agreed, and in any event after default, a secured
> party . . . may notify an account debtor or other
> person obligated on collateral to make payment or
> otherwise render performance to or for the benefit of
> the secured party.

U.C.C. § 9-607(a)(1); <u>see also</u> Ind. Code § 26-1-9.1-607(a)(1); Va.
Code § 8.9A-607(a)(1).

Defendants argue that AFC is not entitled to permanent injunctive relief because it did not request such relief in its First Amended Complaint. As a technical matter, that may be so, but in the absence of any prejudice to the Guarantors, that defect is easily corrected by granting plaintiff liberal leave to amend its Complaint in the interest of justice. See Fed. R. Civ. P. 15(b)(1) (providing that "[t]he court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits").[11] Moreover, in this case, the parties have already had a full and fair opportunity to litigate the merits of AFC's proposed injunction, and the Court has already entered a preliminary injunction on the very same issue, finding that such an injunction was necessary to protect the interests of innocent third parties. The public interest factors that motivated the Court to enter its March 25, 2011 preliminary injunction have not changed, and the Court therefore finds that ongoing injunctive relief remains appropriate in favor of AFC.

Finally, defendants have argued that this Court lacks the authority to enter a permanent injunction, citing several cases

---

[11] The Court will therefore construe plaintiff's Reply Brief Supporting AFC's Motion for Summary Judgment [Dkt. No. 92], which explicitly cites Fed. R. Civ. P. 15(b)(1), as a motion for leave to amend the Complaint, and will grant that motion by deeming the First Amended Complaint to be constructively amended.

19

addressing the scope of a district court's equitable powers in the absence of any underlying statutory or contractual authority. <u>See, e.g.</u>, <u>Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308 (1999) (finding an injunction freezing assets inappropriate where no lien or equitable interest in the assets had been claimed); <u>United States ex rel. Rahman v. Oncology Assocs.</u>, 198 F.3d 489, 496 (4th Cir. 1999) (addressing the authority of a district court sitting in equity); <u>Johnson v. Collins Entm't Co., Inc.</u>, 726 (4th Cir. 1999) (rejecting equitable relief under the <u>Burford</u> abstention doctrine because no federal statute authorized the relief sought). Those cases are inapposite to this civil action because the Venus Security Agreement and Power of Attorney, coupled with the relevant provisions of the Uniform Commercial Code, grant AFC a clear right to collect the Venus receivables.

Ultimately, AFC is simply asking the Court to enjoin any ongoing or future interference with AFC's exercise and enforcement of its contractual and statutory rights. Given the defendants' past behavior, there is every reason for the plaintiff to seek - and for the Court to award - such protection. Accordingly, the Court will invoke its inherent equitable powers and convert its March 25, 2011 preliminary injunction into a permanent injunction barring the Guarantors from interfering with AFC's attempts to collect on the Venus account receivables.[12]

---

[12]   The monies derived from any successful collection efforts, including the approximately $2,507.00 already received

## IV. Conclusion

For the reasons stated in open court and in this Memorandum Opinion, plaintiff's Motion for Summary Judgment [Dkt. No. 82] will be granted by an Order to be issued with this Memorandum Opinion, all of defendants' remaining defenses in their Amended Answer will be dismissed, and judgment will be entered against the Guarantors and in favor of AFC in the amount of $3,156,149.00, with post-judgment interest accruing at the Court's standard rate.[13] By a separate Order, the preliminary injunction entered on March 25, 2011 will be converted into a permanent injunction.[14]

Entered this _28th_ day of June, 2011.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

from Venus's customers and currently being held in the Husch Blackwell trust account in accordance with this Court's Order, should, of course, be applied to offset any final money judgment against the Guarantors.

[13]  Under the parties' agreements, AFC is also entitled to attorneys' fees and costs for pursuing this civil action. That matter will be resolved following briefing by the parties on the reasonableness of any claimed fees, and final judgment will not be entered in favor of the plaintiff until the Court has had an opportunity to rule on any Motion for Attorneys' Fees.

[14]  Plaintiff has been directed to draft the Permanent Injunction Order and submit it to counsel for the defendants for his review before tendering it to the Court.